Neilson, J.
The questions involved in this action are: Eirst, whether a nuisance has been created by the escape of gas from the defendant’s chemical works; and if so,. Secondly, whether the plaintiff has suffered damages as claimed.
The defendant manufactures sulphuric acid after the usual method. The plaintiff’s property is situated nearly two hundred feet southwest of the factory.
It is claimed that the sulphurous gas, not subjected to condensation in manufacturing the acid, escapes and is carried over upon the plaintiff’s premises and into his dwelling, to the annoyance and injury of himself and his family, and the destruction of the trees, vines and plants in his garden.
The testimony taken on the trial is voluminous,— the parties, men employed in the factory, persons residing in or visiting the neighborhood, chemists, physicians, and some manufacturers, having been examined as witnesses.
The case is important to the plaintiff, if his complaints are well grounded; to the defendant, who must have made a large investment in the works sought to be enjoined.
The proof as to the presence of sulphurous gas in the interior of the defendant’s factory, is full and conclusive. The sulphur burned in the ovens is frequently *261 supplied. When the doors of the ovens are opened for that purpose some of the fumes escape. The lead condensing chambers into which the fumes are carried from the ovens, and in which the process of oxidation goes on, though intended to be perfectly tight, are not always so. A witness, one of the chemists, says, that on entering the factory, he inhaled sulphurous gas; that he found the irritating effect the greatest in the furnace room ; except from minute leaks in the lead chambers, where, if a hole were no larger than a pin’s head, he could hardly pass,—found it unbearable ; but that in an hour it would clear up and be quite free from gas. No reason has been given for that fluctuation, nor would a mere opinion on that point be of much moment, the vital fact being that the escaping fumes were found in the interior of the building. It was proved that those fumes would pass through the ventilators,—slat work in the roof.
We are thus prepared to find sulphurous gas on the outside of the factory, and to consider its action and effect.
It goes with the wind, of course. When the gas is blown over on the plaintiff’s place its presence is perceived, in damp and foggy weather more decidedly than when the atmosphere is dry and clear. Inhaled, it irritates the throat and air passages, excites a cough, a suffocating sensation. It inflames the mucous membrane of the eyes, causes them to smart and run water. There were occasions when the gardener could not continue his work exposed to the infected current of air, when, in the extreme heat, the inmates of the dwelling closed the windows as a protection ; of two evils—distress and discomfort—choosing the least. It has also occurred that the physician, on his visit, thought it necessary to put down the windows on account of the gas. One of the defendant’s witnesses, living in a different direction from the works, says: “When the *262 wind is from the factory I try to-get out of the way, it sets me coughing.” Thus, in a circle round the factory, except on the side next Newtown Creek, where there are no dwellings, the gas is felt according to the prevailing winds.
This sulphurous gas bleaches vegetation, and, destroying one crop of leaves after another, finally destroys the tree or vine itself. The plaintiff has thus lost vines and shrubbery. In parts of the neighborhood, and, indeed, of the same garden, vegetation and fruits have done well, but that was so to the extent to which such parts were protected by the walls and buildings. The plaintiff’s garden lies fully exposed, and further on, in the same tra,ck, the florist has lost grapes, plants and flowers on the part of his grounds which was thus exposed.
This gas affects paint, deposits a sulphuret of lead, darkens the color, and renders it less durable.
The evils which the simple people, living in the neighborhood and called as witnesses, ascribe to the gas flowing from the defendant’s works, are the very same evils which, according to the testimony of the experts, would be thus caused. The experience of the persons who have thus suffered qualifies them to speak as witnesses. They knew from actual observation that the disturbing element only came to them in renewed strength when the wind blew from the factory; knew that their hours of security and repose were when the wind moved in other directions.
Several witnesses were called on behalf of the de- • fendant, as to the principal points in contention. In a large degree, however, the contradictions were more seeming and formal than real and substantial. Some of the witnesses, often in the neighborhood, felt little or no disturbance. One chemist, who visited the factory twice, first in 1869, on behalf of the Board of Health, and again in 1870, at the instance of the de *263 fendant, is confident that no gas is evolved from, the factory, felt no sense of its presence. The explanations would seem to be that on the occasiohs when he was there, and when other visitors of like experience were there, the condition of the atmosphere was favorable, and the wind was carrying the gas in other directions. As to the defendant himself and his employees, it maybe said that they have become used to the gas,—in a sense, acclimated. By a beneficent law of nature, persons may become so enured to offensive employments as to lose all sense of their being unpleasant. It is matter of professional and judicial experience that in cases of this class, witnesses come from the gas works, the slaughter house and the bone boiling establishments, to prove that there was nothing in them disagreeable or unhealthy.
It was quite apparent that most, if not all, the witnesses called from this factory and its vicinity were in good health. That fact would be more material if I were at liberty to treat this subject as it would be treated on an inquiry under municipal or mere sanitary regulations. On such an inquisition, the fact that the emanation in question was or was not injurious to the health would be determinate. But in an action like this, it is not necessary, as a condition to relief, that the objectionable agent should be prejudicial to the health of the complainant. It is sufficient, if this gas, escaping from the defendant’s factory, is oppressive to the senses, renders the plaintiff’s dwelling uncomfortable, and sensibly and materially lessens the enjoyment of his property. Though the defendant’s business is per se lawful, yet, being so conducted as to injure an adjoining proprietor, a nuisance has thus been created.
The principle which underlies the question is, that a man is bound to so use his own property as not to injure his neighbor. But for such wholesome limita
*264 tion, the policy of the law as to the acquisition and domestic enjoyment of property might often be defeated. Hence it is, that in a great variety of cases the courts have interfered to restrain or punish the proprietor of the business creating the nuisance, as, for example, when the injury was caused by disagreeable vapors and odors (9 Paige, 575; 3 Barb., 175; 3 Sandf., 126 ; 52 Mass. [11 Metc.], 570; 4 Best & S., 608); by mere smoke (3 Eq. Cases, Law Rep., 409; 4 C. E. Green [N. J.], 294) ; or by disturbing noises (4 Den., 311; 2 Simons N. S., 133; 33 Conn., 118; 5 Barb., 79).
The real question in all the cases was, whether the annoyance substantially interfered with the comforts of human existence and the enjoyment of property.
Some special views suggested on the argument remain to be noticed.
It is supposed that this business has been carried on in a fit, proper and convenient place, as this is a manufacturing district. The words convenient and proper, as applied to the location and surroundings of an objectionable business, were considered in several English cases (Cavey v. Ledbitter, 13 Com. Bench Rep. N. S., 470; S. C., 106 E. C. L., 470; Bamford v. Turnley, 3 B. & S., 62; S. C., 113 E. C. L., 65; St. Helen’s Smelting Co. v. Tipping, 11 H. L. Cas., 642; Crump v. Lambert, 3 Eq. Cas. Law Rep., 409); and in Hew Jersey, by Chancellor Zabeiskie, in Ross v. Butler (19 N. J. Eq., 294). The occasion for such discussions was furnished by the. attempt which had been made, on the trial of Hole v. Barlow, to create a qualification of the general rule by the application of those words. But that case having been overruled, the conclusion is, so far as the general rule can be stated, that the place from which the nuisance proceeds, will not be deemed fit, convenient or reasonable, if the adjacent residents suffer undue annoyance. The cases, above cited, also meet and dispose of the notion that the fact that the *265 district' or town has factories as well as dwellings, or has the former somewhat in excess of the latter, is an answer to the just complaints of one who in his person, family and property suffers from a nuisance caused by the manufacturing business. Even where the smoke and noise, arising from the factories, some of which had existed for more than twenty years, had prevailed, causing serious annoyance to the inhabitants, relief was granted against the party whose works introduced a new element, a material addition to what was bad enough before (Crump v. Lambert, supra). On the same principle, it is everywhere confessed that one chargeable with polluting the waters of a creek by discharging in it refuse matter from his works, could not assign as an excuse, that the waters, as they came down to him, were already materially impure.
But in determining whether the thing objected to as offensive is a nuisance, regard must be had to the character of the neighborhood and of the business carried on therein (83 Mass. [1 Allen], 137; 95 Id. [13 Allen], 95). What may be a nuisance in one locality may not be so in another; what should be patiently endured by an inhab itant of a place like Pittsburgh, where smoke, dust and noise have a general supremacy, could not be imposed upon a resident of a quiet city. The exception to the general rule only applies, however, where the manufacturing establishments are so numerous that “ one more would not add sensibly to the discomfort” (20 N. J. Ch., 208). Thus it is that, the instruction which Lord Cbaxwobth, in his opinion in St. Helens Smelting Co. v. Tipping {supra), referred to as having been given by him in a former case, viz: that the jury were not to consider u whether abstractedly, that quantity of smoke was a nuisance, but whether it was a nuisance to a person living in the town of Shields,” has not been subjected to criticism.
But in reference to that large domain which lies *266 between the extreme cases, it is to be observed that a person living in a town or city cannot stand upon his extreme rights, but must submit to the annoyances commonly arising from the usual trade and business carried on therein. In such instances there has been no perversion of property to extraordinary uses. But the same rule does not obtain as to erections and business not within the usual and ordinary purposes to which real estate is devoted. This exception was vindicated in Carhart v. Auburn Gas Light Co. (22 Bard., 297), and cases there cited, and clearly applies to the chemical works of this defendant.
It is also said that the defendant’s works existed before the plaintiff acquired his present residence, and before his house was built. This claim of priority is of no avail when the right to continue the works or business depends upon a term of less than twenty years (3 Eq. Cas. E. L., 409; 2 Bing. N. C., 134; 4 Id., 183; 2 Washburn on Real Property, 3 ed., p. 236). In Howard v. Lee (3 Sandf., 284), the defendant had carried on the business, creating the nuisance, many years before the Irving House (Howard’s place) had existed. But, in granting relief, Chief Justice Oaklet said: “All trades which render the enjoyment of life and property uncomfortable, must recede with the advances of population.” It might also be justly said that neither the defendant in that case nor the defendant in this, had the right to assume that the vacant lots on the streets laid out in the vicinity of the works would remain unoccupied.
It must be confessed, however, that Chancellor Kent seems to have taken a distinction between the claims of a party who had occupied before the erection of the works creating the nuisance, and the claims of a party who came to the place after such erection. After stating the right of the former to the enjoyment of pure air as an incident to the estate, he adds: “ On the other *267 hand, if a tan yard, for instance, renders the air of a house and garden subsequently established, adjoining it, less pleasant and salubrious, the nuisance is remediless as to the person who voluntarily plants himself near it” (3 Com., 11 ed., p. 575).
If this proposition is to be accepted, it must be because the tanyard has to do with the usual or legitimate business or trade carried oh in a town or city, and as to which, within the rule already stated, people may not stand npon their extreme rights; or as if it were put as an instance in which, by reason of the complainant’s lawful act, a court of equity might well withhold an injunction. But in other aspects, the proposition, as I humbly conceive, is not correct. As a rule of law, it inculcates a doctrine dangerous and pernicious. It would have required, w'thin such rule, but few tan yards and other like establishments to have left Murray Hill and the Brooklyn Heights, now the pride of two cities, uninhabited. In spirit and effect, private property would have been taken without compensation. But since the Commentaries were written, the question has been largely considered, and the plea that the complainant had come to the nuisance is not considered tenable.
The learned editors of 8mitJú s Leading Cases, in the note to Ashby v. White (vol. 1, pt. 1, pp. 445, 446, Phil. ed. of 1866), refer with approbation to the instructions given in the case of Hole v. Barlow, as to carrying on business in a fit and proper place for the purpose ; and in reference to Bliss v. Hall (4 Bing. N. C., 185), and Elliotson v. Feetham (2 Id., 134) are of opinion that the pleas held bad in those cases, might have been good on demurrer had they alleged that defendant had carried on his trade before the building of plaintiff’s house, instead of merely setting up the prosecution of such trade before the plaintiff’s occupation. In other words, that he came to the *268 nuisance, not only to enjoy but to build his house. As a principle of pleading, the distinction is too formal. In the one case, the proprietor, out of deference to the offensive trade, leaves his house unoccupied; in the other, his land unimproved. But the learned editors, while freely using Hole v. Barlow as to the matter since overruled, overlook that part of the instruction given in that case, as to which, on review, no objection was made. In his instruction to the jury, Mr. Justice Btles said : “It used to be thought that when a man went to reside near a place where he knew there was a nuisance, he could not complain of it, inasmuch as he went to the nuisance. That was supposed to be the law many years ago, but it is not so now” (4 C. B. N. S., 834).
In Flight v. Thomas (10 Adolph. & Ellis, 590), the jury found that the mixen used by the defendant and from which the offensive smells proceeded, was a nuisance, and that the plaintiff had come to it. But the plea did not set up that the mixen had been in use thus for twenty years, and the plaintiff had judgment non obstante veredicto.
But the question was put at rest in England, in the cases above cited, so fully that in more than one instance we find counsel admitting, against their own interest, that the proprietor of the works creating the nuisance could not justify by plea of a shorter term than twenty years, thus having a prescriptive right.
As a question of pleading, with us, it is sufficient if the plaintiff aver that, he was the owner of the freehold affected by the nuisance, at the time the acts complained of were committed by the defendant (16 Barb., 565).
It is also urged that the section of the city where this defendant’s works are situated, has no proper drainage ; is malarious, and that sulphurous gas is a disinfectant. It is a disinfectant, and is so used, but, like *269 other remedial agents, is to be used under limitations. I am not prepared to accept a sanitary theory, which, in the application of a disinfectant, has respect to' no regulations for its distribution other than the winds may supply.
It is also claimed that these visitations of sulphurous gas, assuming them to have existed, were not continuous,—may not occur for several days or weeks. It was thus in most of the numerous cases, to some of which I have referred, in which the complaints were as to smoke, gas, and noisome odors wafted to dwellings in the neighborhood of the business to which" objections were made. In one of the cases, the fires were to be so fed as to produce the smoke for about twelve hours only twice a month; and in another case, under the head of disturbing noises, the church bells were only rung occasionally. But, adopting the language of Beamwell, B. (3 B. & S., 84), “I cannot think that the nuisance being temporary, makes a difference.”
The injury caused by the fumes from the defendant’s factory, has been more marked within the last two years than previously. This indicates some growing defect in the work, or some bad management. It may be that from some peculiarity of construction, the difficulty, whatever it may be, cannot be overcome. But I am satisfied, from the testimony of a witness, whose works in Williamsburgh cover six or seven acres, the largest chemical factory of the kind in the United States, that sulphuric acid can be manufactured without any appreciable escape of the sulphurous gas. He says that if it did escape, it would be known in the neighborhood ; that if so escaping as to destroy vegetation, to set people coughing, their eyes smarting, there is something wrong about the works or their management, some escape where there should be none, and that he would find a remedy. That rem *270 edy this defendant must find, if he would continue his business in his present location.
The judgment, to be settled on notice, will be entered for the plaintiff, and the defendant enjoined from so conducting his business as to allow the gas to escape, to the injury of the plaintiff, the incidental damages allowed, and costs.